Counsel may begin whenever they're ready. May it please the Court, my name is Michael Glover, and I'm the attorney for the receiver, Diamond Benefits Life Insurance Company. At counsel's table with me is Ryan Talamante. I would like to reserve ten minutes of my time for rebuttal, and I'd like to begin the analysis of Judge Strand's decision below with the conversion claim. The conversion claim, because it applies to all three of the defendant parties in this case, and also because it has perhaps, although perhaps not, but it certainly has some of the most egregious misstatements of both law and the factual record in the case. The discussion of the conversion claim begins from the platform of Judge Strand's determination that indeed conversion, or the conversion rule, had in fact been met in the receiver's attempts to recover monies that, by all accounts, had been wrongfully misappropriated from it. Judge Strand then moves from that platform of acknowledging through some detailed discussion that conversion has taken place to what he characterizes as a special good-faith exception to the conversion rule. The special good-faith exception to conversion is based upon the notion that one who takes the money from the receiver's account in good faith for value, even in the context of monies that have been misappropriated, is not subject to having those monies repatriated as a converter. The first error in Judge Strand's analysis is simply that the good-faith-for-value rule, as we have come to characterize it, is not a rule that is recognized in Arizona, most particularly because Arizona is a State which is quite clear, does not adopt the principle that good faith is ever a defense to conversion. Now, have they ever carried that isolated statement in, I guess, the U-Haul case to money? It has been considered in the context of money, not just in the U-Haul case, Your Honor, but in, well, cases involving money. Patton, Jabzinski, Safeway Stores actually was a case that involved money, albeit a very modest sum of it, $10.61, I believe. Markle. But the general rule seems to be that someone who takes money in good faith, not knowing it was stolen, is entitled to keep it. Well, that is not the rule in Arizona. Well, but that's what I'm getting at. The good faith phrase or the good faith sentence that you rely on so much is in that court of appeals case involving U-Haul. Have they specifically rejected the money analysis in Arizona beyond that case? And that was not a money case. As I recall, it was stolen paintings in a trailer. Well, Your Honor, U-Haul really isn't the case that we rely on for the enunciation of the initial principle. That would be focal point. When it rejects, specifically rejects that provision, the good faith provision of the Restatement 222A, there are other cases. But that was not a money case either, wasn't there? That was the only one. The truck and the stuff in the truck? That is true. The focal point case was the only case that we have cited that was not a money conversion case. It is the case, however, that established that good faith was never an effective defense to conversion in Arizona. That principle, then, has been repeatedly adopted in Arizona. Whether the matter involves money or does not involve money, that's never been a distinguishing characteristic. But if we were to analogize this to, if we were to treat money as a separate category, which I understand you're disputing, and we're just talking about holder in due course, what's the rule on holder in due course? It's not good faith. It's notice. Is that right? Well, that would be true, Your Honor. And is there an argument about notice? That is to say we have these two letters that are sent on the 16th of June that say where the money is going and where it's coming from. Well, I think that those are certainly compelling facts in favor of the receiver as it relates to the Adventist defendants. Certainly the question, and we characterize that. So wouldn't there be an issue of fact as to the Adventist defendants regardless of whether Arizona does or doesn't recognize good faith with respect to money, correct? Unquestionably. Okay. We raise those factual issues largely in the context of the discussion of whether there was good faith or whether there was poor value. As we get to the point of that discussion that says let us assume for a moment that there is a special exception that would be adopted in Arizona, notwithstanding the substantial amount of case law. To the contrary, even in that context, these parties don't qualify for that protection because they don't meet the requirements of that special exception. Well, when did they get notice of the source of the funds? Wasn't it after the deal was closed? Well, there is a continuum, and I think we need to parcel out the parties first. If we're talking about the Adventist defendants, the knowledge that they would have the transfer was made, they would have gotten information in the form of the copies of the transfer, wire transfer instructions that were directly sent to them. Now, it does raise a number of factual issues potentially about whether that was a written confirmation of something that had already been communicated in spoken word or whether this was simply a follow-up in recognition. Are there issues of fact? In other words, have you tried to produce evidence that there were written spoken communications prior to that? We have. And for example, Kevin Longo, the recipient. Because he doesn't remember receiving the copies. He said he doesn't remember receiving it. So that really is a matter for the trier of fact to weigh. Even if he did, it was after the fact. Even if he did, it was after the fact of the transfer of the money. Right. Whether it was part of the continuum of an understanding that was. Okay. But what's the evidence of the continuum? In other words, you say at the far end you have maybe Longo got the letters. Let's assume he did. You're saying, well, the fact that that was after the fact doesn't answer the question because there's a continuum, maybe. Okay. Do you have anybody who testified that there were oral communications prior to the letters going out? No, Your Honor. But let me give you some of the facts in the record that might lead a trier of fact to the conclusion, and I'll give you some more that are post-June 16th as well. Prior to the 16th of June, the parties had entered into the transaction reinsurance treaty that would result in the payment of this $18 million. The reinsurance treaty was entered into on June 14th at a time when the Adventists were in control of the company. They signed the reinsurance treaties and sent the assumption certificates, which is the written evidence to the policyholders that the obligations of that policy had now been transferred. So they had full knowledge, both of the existence of this agreement, endorsed the agreement, and understood that funds would be coming in. Add to that the fact that they endorsed the agreement. They understood that funds would be coming in. They understood that the $18 million was going to be paid by, what's the name of it, by LACOP. Are you arguing they understood more? They understood more that there was money coming back at that time? Is to say that the $4 million was going to come out of those funds? I am arguing that they certainly – it is our belief that they certainly understood that. More importantly, however, I'm arguing that there's a question of fact as to whether or not they had any understanding. In light of the circumstances that preceded the payment of the funds to them, which included the fact that Resolute, the entity from whom they would receive the funds by all admissions, had no money. And they knew that? And they knew that unequivocally. And they knew the prior criminal record of at least one of the Resolute parties? They knew that unequivocally. So if you – we can continue to back up. At the time that the reinsurance agreement and the initial purchase and sale documents were entered into conditionally, the parties placed these instruments into escrow pending regulatory approval. In the initial documentation, there were many provisions designed to prevent this very kind of misappropriation. Do we know how those two June 16 letters were transmitted? We don't. Our best guess is that by mail in those days, that would have been the most conventional means. So those letters, if the date of the 16th is accurate, those letters would not have been received on the 16th? That's – in all likelihood, that's true, unless there were some facts. We have no evidence of a facsimile copy, so we're willing to concede that the receipt of those may have been several days later. Now, one other interesting observation that goes to this overwhelming factual debate that's at play is that the California Department of Insurance imposed a condition upon the sale, and because there was an imposed condition on sale, the sale could not be consummated unless those conditions were met. In the event that the Adventist defendants received knowledge that the California Department of Insurance conditional provision had been violated and that the monies used to pay them had come from the resources of Diamond Benefits, the sale is not consummated. So this question of the continuum, did this happen before or after the sale, is almost academic. Because you're saying the sale, by definition, could not take place. The sale could not take place. Because the funds came from Diamond itself. Exactly. Which was a violation of the California condition. Precisely, Your Honor. We were hamstrung at the time in trying to evaluate how to undo the transaction. It became apparent to the receiver that the transaction was impossible. It was impossible to undo it. And therefore, we had to live with the consequences of it and seek the remedies in the form of concepts like fraud and conversion, fraudulent conveyance. But if you're looking at the liability and the exposure and the state of mind and the behaviors and the knowledge and the understanding of the parties, I think it's certainly relevant to understand that the condition imposed by the Department had not been met, and therefore, the sale could not have been consummated. Additionally, the Department imposed that condition for the same kinds of thought processes that we might go through if we were looking at this. We look at the fact that they had an investment system set up and protocols for how to use the money and manage it, and then they gave it away, they being the inventors. They simply folded on that requirement, and they slowly began to release all of the protections inherent in the original documents through the subsequent amendments. Those amendments, by the way, were not disclosed to the Arizona Department of Insurance, who had approved earlier in March. The California Department, though, had that information. The California Department looks at these fact patterns, the same ones we asked the judge to look at, and said Resolute has no money. It has these assets, these contingent assets that are highly encumbered. It looks like a real estate dealer to me. I have a lot of concern about this LACOP transaction and this incredible amount of cash that's coming in. I'll tell you what, people. Before you can do this deal, let's be clear that the money cannot come from dining benefits. It's a very unusual provision for a regulatory agency to impose in a transaction like this. But the reason it was imposed was because of their sensitivity to the same fact patterns that led them to the conclusion that dining benefits was ripe for pillaging if the personalities were the wrong personalities. And clearly, Joint Health Ventures had that information and more, and then subsequently, and not soon thereafter, became aware of the fact or should have known by the facial evidence of the documents they had received that the monies indeed had come out of Diamond in violation of the court order. Similarly, along that continuum, Home Fed was the recipient of the funds on the 24th and Continental Bank on the 16th of June. In analyzing, though, for a moment, the question of whether or not a special exception does exist, Judge Strand made a couple of significant misstatements. For one, he says that dining benefits does not challenge the fact that the defendants gave valuable consideration and acted without bad faith in receiving the funds. That's categorically untrue. I suspect that the fact that three and a half years passed before we argued the motion in front of Strand and he decided it may have resulted in some diminishment of his recollection. Could you address the fraudulent conveyance point? Certainly, Your Honor. The critical aspect of fraudulent conveyance, as Judge Strand articulated it, has to do with this question of whether the transfer was made by the debtor or at the hands of the debtor. Judge Strand embraced his two Montana cases, each of which is about two or three pages long, that make this rather general statement because they're simply mimicking the language in the Fraudulent Conveyance Act that says that the transfer has to be made by the debtor or at the hands of the debtor. Judge Strand, reaching out to Montana, when he has Spanier, an Arizona case in his own backyard, he reaches out to Montana and he says, you see, the statute is literal. It means it has to be made by the debtor. And Dining Benefits, although I acknowledge it was their assets that were transferred, this was not a transaction that was made by them, either for their benefit or not. Well, why wasn't it made by them? I mean, it looks to me like it was made by them. That's what I was going to ask you. Exactly. In its simplest form, Your Honor, that is. And I think it's your benefit to argue that it's made by them. Correct. So don't try and talk me out of it. Okay. I guess they can talk me out of it, but you don't need to. They're representative over there. Okay. Fine. The fact that the transfer of the assets were made by the debtor in the case of Dining Benefits takes us to the next level of analysis, which gets us into the 1009 remedial portion of the Uniform Fraud and Conveyance Act. In there, the defendants argue that even assuming that it was made by the transfer, was made by Dining Benefits, that nonetheless they paid, number one, that they paid fair consideration for what it was that they got. But the consideration, your point is the consideration wasn't paid to Diamond at all. Yes. So they couldn't have received adequate consideration. Correct. Correct. Okay. I know this seems very obvious. It seems equally as obvious to us. And the factual intensity of the record as well, certainly at a minimum, leads one into an active debate about whether there was consideration and how one identifies a consideration. As it happens here, all the parties acknowledge the fact that we didn't pay Diamond anything. But nonetheless, we were paid. On the fraudulent conveyance point, it puzzled me. I gather the fraudulent conveyance argument claim was made against everybody but Continental. Why was there no argument made against Continental for fraudulent conveyance? It has to do with the unique procedural history of the case, Your Honor. It's simply that Continental was released from the case fairly early on as a result of what ultimately turned out to be the judge's misapplication of a law related to whether money could be converted. And when our firm got involved, which was approximately 6 or 7 years into the litigation, we looked at the file and we said, there's been a horrible mistake here. And we were before this Court a few years ago on the issue. And we were able to – well, we knew there had been a mistake. We filed a motion for reconsideration on the issue of the conversion claim, which was what the judge had ruled on. We made a calculated decision that given the fact that the claim was stale in relation to the time the judge originally ruled on it and when we were bringing up for reconsideration, that it was in our best interest not to be greedy by not only asking for reconsideration there, but filing a complaint that would amend and add an additional charge. So we thought that the best interest of the client was to play conservatively, to note what we thought was a clear and egregious error on the conversion count. The remedy rights would ultimately be the same. We were fortunate enough to get the judge to reverse his earlier ruling after a number of years had passed on the conversion count. And that's the only reason really why. So they just looked at historical accident. They just looked at it. We hope it's not the end of the story. But for the time being, they have looked at it. But the Continental is back in the case with respect to conversion, but not in front of us now and in a separate case? Well, they are in front on a consolidated appeal on the conversion claim. But only on the conversion claim? That is correct. Okay. Got it. Your Honors, I see I have now two minutes. You may reserve the rest if you'd like. Thank you.  May it please the Court, Joel Hoxie on behalf of Continental Bank. As we had advised your courtroom deputy several weeks ago, we have a total of 20 minutes. There are a number of issues involving the other defendants besides Continental. The only issue before Continental is the conversion issue. I will hit the highlights on that. Although from some of your questions, it appears that there may be follow-up questions that are more appropriately directed to my colleagues, especially the Adventist defendants. The first thing I would like to emphasize is that with respect to the summary judgment record in the appeal involving Continental Bank, the receiver did not dispute any of the statement of facts submitted to the trial court. Therefore, the receiver conceded that Continental had entered into this settlement agreement with Mr. Reeder to pay off his $10 million-plus loan that was due and payable and in default to Continental Bank. There was a specific settlement agreement pursuant to that agreement. Mr. Reeder wire-transferred $8.77 million to Continental Bank in accordance to the letter with the wiring instructions set forth in that settlement agreement at page 7. Continental, it is undisputed, did not know the source of the funds subject to the wire transfer other than the originator's bank was Fleet Bank in Providence, Rhode Island. In return for the payment of its loan pursuant to the settlement agreement, released millions of dollars worth of collateral, personal guarantees, and gave a full general release in favor of Mr. Reeder and his corporations. And it was not for several months thereafter that Continental Bank was first put on notice of any relationship dealings between Mr. Reeder and Diamond Benefits Life Insurance Company. I'd like to start with Judge Nelson's query about the general rule with respect to money and conversion claims and the general rule that one who takes the money in good faith and gives valuable consideration for it is not subject to common law conversion.  I agree there is no case law out there to support the notion that Arizona has rejected that well-settled precept. If Continental had had notice, under your view of Arizona law, is it subject to the ordinary rule of negotiable instruments and holder of due course? If it had had notice at the time it got the money that there was some problem, would we come to a different answer? I think it would be a different issue. I'm asking you to give their case away, in other words. Something I'm hesitant to do, obviously. It would be a different issue. I don't think it comes into play with respect to the conceded facts in the Rule 56 record before Your Honors here. The cases upon which the receiver relies, and there are five of them, you have the Focal Point U-Haul case, Markle, Patton, Jabsinski, and Safeway Stores. In none of those five cases do you have the twin elements of receipt in good faith and giving valuable consideration. That was certainly not the case in Patton, even though four of those five cases involved money. That was not the case in Patton, which was the Arizona Supreme Court case in 1978, where you had the savings and loan thinking in good faith that it could exercise a due-on-sale clause, and therefore it thought in good faith it had the legal right to take the plaintiff's $2,000 savings account, which had been posted for collateral and which, pursuant to the collateral agreement, was due to be released back to the borrower after two years. After two years they didn't release it. Their argument in defense of conversion was that they felt that their due-on-sale clause was enforceable. The courts later determined that that was not the law in Arizona, and therefore they could be held liable for conversion. The most important case, I believe, is the Markle case, which was handed down in 1968 by the Arizona Supreme Court. In that situation you have Transamerica Title serving as an escrow agent, and you had a battle between the first wife of a decedent and the second wife of a decedent. The first wife claimed that she had a constructive trust interest in the eventual sales proceeds from a piece of real property pursuant to a divorce settlement. Wife number two had entered into an agreement with the escrow agent claiming that when the land was sold, she was entitled to the proceeds. The escrow agent had been put on notice by wife number one that she had this constructive trust. Nonetheless, the escrow agent allowed the disbursement of the funds to go to wife number two. And in that case, in the discussion, the Arizona Supreme Court cited to Pomeroy's work on equity jurisprudence and stated that in equity, the court can reach property beyond the original wrongdoer until there is a good faith purchaser for value. It wasn't a central issue in that case, but there was a discussion and a reliance on Pomeroy. More importantly, and it did not come up in the receiver's discussion, we think the trial court was wrong in determining that Diamond Benefits had a legal right to immediate possession and control of the funds in the fleet account. On August 29, 2002, literally at the same time, within days of when Judge Strand issued his order granting summary judgment in the case involving the Adventists and FDIC, the Arizona Court of Appeals handed down the universal marketing case. And in that case, you had a situation where the plaintiff, universal marketing, had relied on a fellow named Wenzel as sort of an informal escrow agent. He had a general checking account at Bank of America. They wired $50,000 into this fellow's account, and the thinking was that eventually Wenzel would help them buy a business, and then he would inject those $50,000 into this new business. But along comes Bank One, a judgment creditor to Wenzel. It garnished the funds in the account. Universal marketing put Bank One on notice that it was really their money, they said, and Wenzel was merely an escrow agent informally. And Bank One said, we don't care. They took the money. They got sued for conversion. They wanted the trial court, and it was affirmed by the Court of Appeals that said in that situation, it was a general checking account similar to what we have with the fleet account. In that situation, the entity with the immediate right to the funds was Bank of America and not universal marketing, and therefore there was no common law conversion. Unless Your Honors have any questions, I will turn it over to my colleagues. Thank you. Good morning. Clifford Roth here on behalf of the FDIC as receiver for Home Fed. Also present is Kathleen Gunning from the FDIC Appellate Division in Washington, D.C. So your argument is going to be the fighting on conveyance argument. I'm here to address that. Before I do, though, let me join in Mr. Hotze's comments with respect to conversion and note that certainly he's not giving away our defense on conversion with respect to any notice argument. The notice that Home Fed received that Diamond Benefits was involved is a mere notation on the wire transfer that the remitter was Diamond Benefits. And it's completely consistent with the information that came from the party that we negotiated or that Home Fed negotiated on behalf of Reeder, their attorney, James Patterson, told the account officer at Home Fed that the money would be the source of the money would be a loan from an insurance company. We had no notice beyond that. There's no question of fact that Home Fed acted in complete good faith throughout the entire transaction. But with respect to fraudulent conveyance, we would submit that this Court should affirm not only on the ground relied on by the district court, but on five alternative grounds, and that unless the receiver overcomes all six of those grounds, you should affirm. I'm sorry. Go ahead. I'm just going to say, speaking only for myself, I don't find the district court's reasoning at all persuasive. It appears to me that the transfer came from Diamond, and the fact that an individual helped it occur is kind of a so what in a corporate context. And that the money, the consideration did not flow back to Diamond. So maybe you could move to some of your other grounds. At least that might help me. Well, certainly we believe that the trial judge did get it right that these conveyances were made by parties other than the debtor. Their entire theory of the case is based on that. But they were, at that time, corporate officers. With respect to the timing of Home Fed, that is true. But they were not conveyances by the debtor. They were looting transactions. They're completely unauthorized. Well, I understand that. Okay. But my signal is I agree with Judge Graber that that argument is not convincing to me. Okay. But some of your others may be, so. Well, let me address two other arguments, then, in the limited time that I have. The issue as to who the consideration needs to go to. Certainly we believe that their normal and natural reading of the what's called the savings clause in 44-1009 allows the focus in that section is on a purchaser for fair consideration, as opposed to the predicate statutes that precede that, where it deals with a conveyance made by the debtor without fair consideration. So I believe that the court can certainly interpret that statute as allowing consideration to parties other than the debtor. But that most certainly is not the case with respect to the authorizing statute for this insurance receiver, the insurance statute 20-636, which is quoted at page 24 of our brief, that indicates that even if you were to conclude that the exception in 44-1009 doesn't apply, and even if you conclude that the transfer would otherwise be a fraudulent conveyance, the receiver, this insurance receiver under that statute that authorizes their claims for fraudulent conveyance is expressly limited and only and prohibits, rather, recovery of conveyances that are made to bona fide holders for value. And that gets back to the point that Judge Nelson began with, and it ties into what Mr. Hoxie was saying in quoting the Pomeroy on equity that's cited in the Markle case, that when you are a purchaser or in the terms of 20-636, if you're a bona fide holder for value, the focus is on whether you're acting with bona fide or bona fide meaning in good faith, and whether you're for value, meaning you give up value. There is absolutely no requirement under the statute that requires that that consideration be given to the debtor. And certainly with respect to a homeowner or a homeowner's debtor, it's not a fraudulent conveyance statute. That is to say, value to whom? That is to say, Diamond is transferring, if I'm right that Diamond is transferring, and Diamond is getting nothing. Reeder is getting a lot, but Diamond is getting nothing. I understand that you gave up a lot, your client gave up a lot, but the question for fraudulent conveyance, unless I misunderstand the law, is what is the entity that's doing the conveying getting back, and they're getting nothing. Well, there is an additional layer because of who these plaintiffs are. They are insurance receivers. They are appointed by the State court pursuant to State insurance statutes, and one of those statutes says, as an additional limitation on what would otherwise be available to a party to avoid a fraudulent conveyance, it says, such property or its value may be recovered from anyone who has received it except a bona fide holder for value as specified in this article. Now the article doesn't go on to define exactly what a bona fide holder is, but there's And even in the restatement, restatement section 173, comment B says that a transferor is for value, although the consideration is not paid to the transferor, but is paid to a third person at the direction of the transferor. So, again, on that ground alone, it was an alternative ground. It was raised below. It's fairly presented and supported by the record that this Court should affirm. Is there anything about the fact that the money was going to the individual corporate officer who had some kind of duty towards his corporation that did or should have put your client on notice that it wasn't a bona fide transfer? I certainly don't know how that could be the case. And, again, they're not even arguing that that's the case. I'm asking, though, whether they're arguing it or not, is that an unusual situation where some large thing is transferred from a corporation and the consideration flows back to an individual corporate officer? Is that not a potentially suspicious circumstance? I don't believe there's anything suspicious with respect to the transaction involving Home Federal. It had a group of debtors that were in default. They negotiated a discount. They negotiated solely through the attorney acting on behalf of the debtors. And as a result of a negotiated, very carefully documented settlement agreement, a wire transfer was to be made, and the collateral that everybody agreed in the settlement agreement exceeded the value of the payment that was received, that collateral was transferred to one of the related companies, Indrio, on behalf of another reader corporation. So we're settling with the reader group and conveying our collateral to the reader group. There is nothing about that that would give rise to notice. I have to save some time for Mr. White to address his issues.  Mr. White, you're up. Good morning. And given the discussion to this point, perhaps the best use of my time is to talk about exactly what is or isn't in the record on the questions that have already surfaced. First of all, there is absolutely no evidence whatsoever in the record that anyone connected with joint health ventures or Diamond knew ahead of time the source of the money for that purchase. Can I back up and just establish a point of law, if it can be established, and that is under Arizona law, if, and I understand that this is an if, if your client knew at the time it received the funds, the true source of the funds is their conversion. That would be, if they knew that would go to the good, whether factually there was an issue or not on the good faith caveat. So I'm asking, if they had notice of the source of the funds at the time they received the funds, is that conversion, is that satisfy the conversion requirement? That would satisfy the conversion requirement in the sense that we would not be able to talk about the good faith issue being a preclusive. Right. Okay. So in other words, so now we're getting back to the question then, was there evidence that shows you were on notice? Okay. Right. Now, I think there are other questions about whose money this was and so forth. I want to get to that in a moment. But the good faith requirement would be satisfied if your client had notice at the time it received the funds of the true source of those funds. Well, notice and good faith, would they be the same, at least be a fact issue for trial? Right. Okay. It's discussed as good faith under Section 229 of the Restatement, which is what Arizona law would apply here in 229 of the Restatement. So now the question really in front of us is not the legal question, but the entry question. Because I believe there is a good faith element to conversion when you're dealing with monies. And I think the Judge Strand correctly recognized that. But on those facts about is there or is there not a fact issue surrounding good faith, there is nothing, nothing in the record that indicates that Joint Health Ventures, Adventist Health System West, or Diamond Presale knew about the source of those funds. Now, you say nothing. What are we to make of, and I understand even under the most favorable from their side view of that evidence, but we have those two letters and there's a CC to Mr. Longo. Right. So there's something. Let me get at that this way. That transfer of that money took place on June 15th. As you've seen, those two letters are dated June 16th. There is no indication that those letters were received on or before June 15th. So was there notice after the fact? Well, it's not even clear that those letters were sent and who they went to at what address. But let's assume that they were sent and Mr. Longo did get them. It's clearly under any interpretation after the fact, just as if he had found out yesterday that the money had come from the LACOP reserve fund. Your position is really an absolute position, then, even if it had happened on the same day, but five minutes later, you'd be taking the same position, I take it. If you received the money, you put it in the bank, and then someone comes into your office and says, guess where this money came from? You'd say, hey, it's a done deal. My position is, is that that good faith is measured at the time of the transfer of the funds. And at that time, there was no knowledge. That's right. Now, let me go to those two letters, though, because there is more to it than those being after the fact. The clear record shows that those went to Kevin Longo. Who was Kevin Longo, as he said in his deposition? What was his role and so forth? Kevin Longo, an employee at the company, was told this is his only involvement with the transaction. He is told by others at Adventist West, make sure that the purchased money was received at our bank in California. Call the bank and see that we got paid. That's what he did. He found out that they were paid. Now, Mr. Longo, as he testified, knew absolutely nothing about conditions on where that payment came from, knew nothing about LACOP, knew nothing about the fleet bank, knew nothing about the transaction. He had one task, and one task only was to find out whether that money went into that account. That's what he did. He did nothing more than that. And I'm not sure that this is a letter to Mr. Bell, but it does sound to me in a way as to why he would be a CC on this letter, that is to say, he's a CC to a letter between two different people. So it doesn't sound as though this letter is in response from a phone call to him, did the money get paid? Well, we can speculate forever about what Mr. Bell, whether he put him on there for a particular reason, whether the letter was sent or not. But it doesn't sound as though, but it's pretty clear, at least from your story, that it doesn't sound to me as though he's put on the CC for the reason you just gave. No. There might have been some other reason he got on the CC, but not because he was told to call up and find out if the money was paid. All I'm saying is this, and this isn't my story. I'm coming back to the record again, because this is the problem we had in the district court, was not arguments, stories, theories. It was what, in fact, was in front of the court. Yeah, sure. And Mr. Longo was deposed by them and asked these questions. What was his involvement with this transaction? What did he know? What was his role? What did he do? And that's his testimony. And there is nothing that contradicts it. Now, Mr. Bell is acting for the district court. Well, but I have to say, but his testimony is, the only job I had was to make a phone call to find out if the money was received. I look at this letter, and I say, well, that testimony is kind of screwy, because that, the CC on this letter doesn't correspond with his having made a phone call to see if the money was received. He, that is his testimony, and nobody's saying anything to the contrary. Nobody said anything to the contrary. Well, I think the question is whether the confirming letters create an inference that suggests that there's an issue with them. If there's more, Mr. Bell was deposed, Mr. Bell did not indicate anything more, or that would have been in the record, and it's not. Mr. Bell was asking, acting on behalf of Christopher, and this, these are people engaged in criminal activities. I don't know what kind of deference they get, but it seems to me it ought to be none. Now, how does this come about? The transfer is on June 15. Christopher has no role at Diamond on June 15. None. He becomes an officer. He becomes the president and chairman of the board on the 16th. So when you talk about the corporate insider or principal making the transaction on the 15th, the receipt of the lay cop money and the sending that out on the 15th, they get it on the 14th, they send it out on the 15th, is being done by Christopher for Christopher. He's not Diamond at that point in time. We have the company, and he has never been an officer director. The most that they could do, and I realize this is slightly different than it is with the other defendants, because those transfers were later, and so the question posed to them is slightly different. But what I'm saying is to us, when the transfer goes out on the 15th, Christopher is Christopher the criminal. Christopher is not Diamond, and there's zero evidence of anything to the contrary in the record. The only way they try to get there is to say that on the 16th, when he becomes the president of Diamond, when they take over the company and becomes chairman, that somehow there is a ratification of all that they've done. But that's not the issue in front of us on this particular point. The issue is what did you know or what did your client know or when that money was transferred. And if, for example, your client knew precisely what you're trying to persuade me of, that is to say, Christopher is doing this in an extra legal way. He's looting the company, and the $4 million is being paid because Mr. Christopher is behaving illegally, well, that's conversion. So I mean, what you're saying now is neither here nor there on this point. Well, I guess what I'm getting at are ways in which I'm saying that at the time of the 15th, we did not know the source of those funds. But here, let me construct the evidence as it's been constructed on the other side, and you can tell me why this isn't enough. Okay. You knew that Resolute didn't have any money. Did you know that? No. Should I take these one at a time and say what the record is? Yeah, please. Yeah, because I'd like to go run through, I mean, this is what your other side said, and I'd just like you to respond. Okay, you knew Resolute didn't have any money, and your response is? That is not the evidence. The evidence of what we knew and what the regulators knew, and this bothered neither the regulators or us when the regulators came to approving the transaction, Resolute submitted to the regulators a financial statement that showed a negative net worth. This is this notion that they have no money. Now what did that financial statement show? It showed that they had a negative net worth because the accountants did not put on their contingent notes given to Resolute there were $100 million. They were contingent in the sense that they would be pulled back if the company didn't buy Diamond. In that narrow sense, the accountants say you can't reflect it on the statement. They put it in a note to the statement, but they don't put it in the statement. That's one thing. The regulators looked at that and said, all right, this is not as if Resolute has no money. There are notes behind it. In any event, Resolute had a matter of days before gone out and bought a significantly larger insurance company in Rhode Island and paid for that. So it had purchased a larger one. The regulators knew that, took that into account. Also, the principals behind Resolute, Reeder and Hilltop and a number of others, also submitted financial statements that the regulators had that showed very substantial net worth. So what was Resolute to be, what were the principals behind it in terms of assets and so forth, all of that had been examined by the regulators. All of that indicated that they had wherewithal to either borrow the money or come up with it. Okay, I got it. Now, second point, California makes an explicit condition of their being willing to issue a license here that the money used to purchase Diamond not come from Diamond's assets. They didn't. They didn't. Now, was that an unusual condition to impose upon a licensing deal? Well, the answer is... I'm told that it is, so I'm asking you if it is. It is more uncommon than common. It's not like it never happens, but it did happen. But there was some, in other words, there was some reason that the California Insurance Commissioner had, there was something that he gave him reason to suspect that there might be a problem, and your client probably should then have at least the same degree of suspicion. Now, suspicion is different from knowledge. Right. But there's some reason for concern expressed by California, and you knew that. No, I think what happens is... No, wait a minute. You knew that California had put that condition on? Yes. Yes, okay. Yes, and had absolutely no reason to believe that the condition wouldn't be met, just as California didn't, else they wouldn't have approved it. Now, did you know of the prior criminal record? I believe it's of Mr. Christopher. Yes. It was in the submission. Okay. So you say you have no reason to know that it wouldn't be met. You know that California has imposed this condition, and you know you've got a crook who's one of the purchasers. But you had no reason to suspect this. We knew that Charles Christopher, 13 years earlier, was not a crook. Thirteen years later, had been subjected to a wiretap, finding of being a felon on a wiretap, had been disclosed. Christopher was not to be the principal of Resolute or Post Sale Diamond at the time. That was disclosed to everybody. The Arizona regulators, the California regulators, and us, and yet that transaction was approved all the way through. Now, what happened? I think it's worth taking a moment to see this, because Arizona regulators approved it, California approves it, and we're going forward with this transaction, and everybody assumes that this is going to be handled as it's disclosed, and that the transaction will move forward. What occurs is something that I suppose, in hindsight, maybe it's easy to look at, but what you have to understand is this. Within four days of the closing, Carlton Burt, not Christopher, is to be Diamond and is Resolute. That's the representation to everyone, okay? Four days beforehand, he is removed from Resolute, and Christopher comes in and takes over. There is no evidence that we knew, couldn't be any evidence that we knew until after the sale, that all of a sudden Carlton Burt, the one who is Resolute and so forth,  Okay, that's four days. Remind me the dates as to when Burt was out and Christopher comes in. What's the date that that happened? June 10th. June 10th. So before the money changes hands. Right. Did you know at that, did you know before the money changed hands that Christopher had taken over? No. That's my point. There is no, so There's no evidence that you knew that? Absolutely none. Okay. Absolutely none. There's also Counsel, if you would sum up, you have vastly exceeded your time. And it's my fault, so I'm sorry. Give us a short But I would say it's also true that there is no evidence that our client, my clients knew that LACOP got an instruction that said send the money to a fleet account. My clients knew nothing about the fleet account. They knew nothing about LACOP being told send the money to fleet account. Knew nothing about that. Knew nothing about the account. Knew nothing about the movement out of the account. Okay. Thank you, Counsel. Thank you.  Thank you, Your Honor. Dealing from the last argument going forward. Clearly the defense here is the Hogan's Heroes, the Sargeant Schultz defense. The information may be out there, but I see nothing. I hear nothing. And I know nothing. It's interesting that Mr. Longo would testify to significant memory lapses and not having really any clear recollection of whether he received the letters or did not receive the letters. He couldn't really recall and so on and so forth. Quite predictable, actually, since Mr. Longo works for the Adventists. And so what we do is we take that information, we take that evidentiary information of a witness who, if one were sitting in front of him, might view him as completely uncredible and we match that with the documentary evidence, which is the CCs on the letters that we can only assume were sent. What do you have in the record? Let's assume for a moment that opposing counsel's construct is correct, that even if one learns afterwards that the money came from where it shouldn't have, as long as that money is actually completely 100 percent received, before that knowledge arises, they're home free. Let's assume that for now. What evidence is there to suggest that there was knowledge before the moment of the transfer? Well, it would begin again with the original development of the purchase and sale and the conditions imposed at that time to ensure the sanctity and the integrity of the funds that everybody knew were going to be transferred in. So there was an investment committee established and certain rules and requirements for how you hold that money. Because the funds coming in from policyholders is rather sacred. It's a trust fund, essentially. All of those conditions, again, were given away. Systematically, over the period of time when it was held in escrow, those conditions were given away. This was the beginning of an acknowledgment that the Adventist's desire to get out of Diamond Benefits and get away from this insurance company exceeded their fiduciary responsibilities to the company. They were more concerned about making a profit and exiting out the back door than they were in protecting the interests of the policyholders. Well, that's conclusory. I understand that's the inference you want us to draw. But what specific facts are in the record to demonstrate knowledge before the June 15th date? Well, again, the knowledge that the funds were going to be coming into Diamond Benefits, the execution of the assumption certificates which binds them to that contractual relationship at the time the Adventists controlled the company. And I want to reiterate again also that the conditional approval, it is one of six conditions. The sale hadn't yet occurred at the time the transfer was made. It was simply a part of a continuum. Do you agree or disagree with the assertion that there's no evidence that the defendants knew about specifically about Christopher coming in on June 10th? I fundamentally disagree. And I think actually Judge Strand would disagree. Judge Strand, one finding that he did make was that Christopher might be considered a limited agent as it relates to LACOP, a limited agent of Diamond Benefits as it relates to LACOP. It wasn't a situation where Christopher was this unknown, very shadowy figure in the background. He was a prominent player. And whether or not he was going to be the president of Diamond Benefits or a major player at the holding company level is almost immaterial. They knew that Christopher was negotiating the LACOP deal. Very unorthodox situation where you have somebody who you don't know who's involved in some real estate enterprise with this Mr. Reader. You're going to allow them to negotiate a reinsurance treaty worth $28 million, significantly dwarfing the size of the business you presently have on your books. You're going to bind yourself to that obligation on the strength of his negotiation of the terms of that deal. And then you're going to bind the company. Therefore, if the deal doesn't go through, you're stuck on June 14th. I think they clearly not only knew that Mr. Christopher was prominent, but they relied upon him in the negotiation of the transaction, which by anybody's account was going to result in an enormous infusion of cash for a cash-strapped company, an enormous infusion of cash that could be used. Certainly the California Department thought this was a possibility by unscrupulous investors in the event that there weren't some protections in place. I think one of the fundamental questions you really have to ask in looking at this question of kind of good faith behaviors and knowledge and what can we assume they knew or did not know is why wouldn't the Adventists have simply asked the question of whether the conditions had been met? They made regulatory representations. They made representations to the regulators. Is there any? Oh, go ahead. If there were no other evidence, is there omission to ask that question, evidence of good faith, bad faith or anything else? Certainly of bad faith. I mean, I think if you say no evidence, do you mean if they had no way of knowing If that's the only evidence we have is that nobody asked that question, I don't see where that gets you. Well, I guess the best way to look at it is this, Your Honor. If you were to enter into a contract with another party that had terms, you would probably want to satisfy yourself that the terms of that contract had been met before you relinquish what it is that you have and that you receive what it is that you get. It's just ironic to me that they're selling an insurance company worth tens of millions of dollars with all these fiduciary responsibilities and the one thing they did not think to follow up on is this question of whether they were the recipient of funds out of Diamond Benefits. It's not just the two letters, by the way. There's also a third instrument, which is the bank advice that was sent on June 24 to Adventist West and that clearly has an indication of the remitter there is Diamond Benefits. Let me ask you this. The purchase price paid starts out at $2 million and then because of additional amendments ends up just under $4 million for this company. Correct? That's correct. Is there any indication in the record that that was a particularly advantageous price from the standpoint of Adventists? Well, I guess... What I'm after is, is there some reason why they wouldn't want to have known if there was a problem about where that money was coming from? Yes. The short answer is, yes, there is evidence in the record. It's a rather voluminous record, the trial court below, but the evidence would simply be this. The company had been stripped down and was just going to be a vessel for the receipt of this enormous amount. Basically, the company, after they were done stripping it down, you were buying licenses in Arizona and California. That's what you were getting. Well, I wasn't. That's what Diamond was getting. Diamond wasn't getting anything out of the transaction, but Resolute... I'm sorry, that's what Resolute was getting when it bought Diamond. That's what Diamond had when it bought Diamond. That's what Diamond had. It had been stripped of everything that was identifiable, became a vessel for cash, and this is what concerned the California regulators. The Arizona regulators did indeed approve this transaction. They forgot to mention one point, which was that the record that they approved it on was incomplete. It wasn't the same record that California was looking at. California had the best perspective of the transaction, and they said, this scares us a little bit. Did you make this argument at summary judgment to Judge Strand that there might have been some reason that this purchase price was overvaluing the asset that was being bought, and therefore the sellers might have been slightly encouraged not to look too closely at where the money was coming from? We did, and quite a bit more than that, actually. This whole concept of the Adventists wanting to get off of this risk, get out of this line of business, and having this developing sense of desperation, and that information comes from the board minutes of the company. If this were a case were to go to trial, and it should be in the record and I just don't know it, is this a jury case or a to-the-bench case? It is not. It's a judge case. Okay. I believe. Yeah. So it's not a jury case. Okay. Thank you, counsel. Thank you. We appreciate the arguments of all of you on this very complicated matter. The case just started is submitted, and for this session we'll stand adjourned. All rise. This court for this session stands adjourned. All right. Safe trip, Michael. No. I know. There's much reason to be terrific at that. I can't hear you.  Thank you very much. Thank you very much. Thank you. Yeah. Still on board? Yeah. Is that you? Yeah. It's been the longest tenure I've ever had. I'm about to take a picture. Oh, thank you. See you later. See you guys. All right. I'll see you all in the next lap. Thank you for all your help. Thank you. Thank you. Thank you. Thank you. Thank you. Yes. Okay. Okay. Okay. Okay. I am saying that it is not proven in this record. It is not. And indeed, the affidavits appear to be quite carefully drawn. And they say he was diagnosed with thyroid cancer. They get that. And it's a classic four.
judges: Tg Nelson, Graber, W. Fletcher